**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-02319-DDD

JASON WRIGHT,

        Plaintiff,

v.

NATIONAL BOARD OF MEDICAL EXAMINERS,

        Defendant.

---

### NBME'S OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION [ECF #8, FILED SEPTEMBER 15, 2021]

This lawsuit relates to Plaintiff Jason Wright's ("Wright") request for extra testing time and other accommodations on Step 3 of the United States Medical Licensing Examination ("USMLE"). Wright passed his first two Step exams without accommodations. He now is seeking extra testing time because he has been unable to pass Step 3.

Wright claims he should receive accommodations because he has been diagnosed with a reading disorder and Attention-Deficit/Hyperactivity Disorder (ADHD). There are significant reasons to question the bases for these diagnoses, but in any event, a diagnosis alone does not mean that someone is disabled within the meaning of the Americans with Disabilities Act ("ADA"). Instead, to be disabled within the meaning of the ADA, Wright must show that he has a physical or mental impairment that ***substantially limits*** his ability to perform one or more major life activities ***as compared to most people in the general population***. The objective evidence, however, shows that Wright successfully moved through school without any interventions or

accommodations, and that his reading and attention skills—as measured by his evaluator—are not impaired.  Wright is not substantially limited in reading or any other relevant major life activity relevant to taking the Step 3 examination as compared to most people.  Wright has not shown a likelihood of success on the merits.

Wright's claim of irreparable injury also fails because there is no "emergency" here and his other allegations of alleged harm are speculative and insufficient.  The other preliminary injunction factors likewise do not weigh in his favor, particularly in light of the heavy burden for obtaining mandatory preliminary injunctive relief.  His motion should be denied.

## BACKGROUND

### I.   NBME and the USMLE

NBME is a non-profit organization whose mission is to protect the public health through the development and administration of high-quality examinations, including the USMLE.  Decl. of Lucia McGeehan, Ph.D. ¶¶3-4 ("McGeehan Decl.").  The USMLE assesses an examinee's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.  *Id.*  Licensing authorities across the country rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine.  *Id.* ¶5.

Three "Step" exams comprise the USMLE:  Step 1, Step 2 Clinical Knowledge (Step 2 CK), and Step 3.  *Id.* ¶6.[1]  Examinees take the USMLE under standard conditions, including standard time conditions.  NBME provides accommodations, however, to individuals who have a

---

[1] The USMLE previously included, and Wright took, a Step 2 Clinical Skills ("Step 2 CS") examination.  *Id.* ¶7.

disability within the meaning of the ADA. *Id*. ¶8. In all instances, NBME's objective is to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage…. As administrator of the national exam used by ... states for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking it." *Powell v. NBME*, 364 F.3d 79, 88-89 (2d Cir. 2004). NBME also has a duty to protect the integrity of USMLE scores, given the USMLE's role in helping jurisdictions ensure the minimum competency of licensed physicians.

## II.     Wright's USMLE History

Wright took Step 1, Step 2 CK, and Step 2 CS of the USMLE between 2011 and 2013. He did not request accommodations on any of these examinations and passed all three (passing Step 2 CK on his second attempt). McGeehan Decl. ¶¶12-15. Wright took Step 3 two times in 2017, without requesting accommodations. He did not pass. *Id.* ¶¶16-17.

In October 2018, Wright submitted his first request for accommodations to NBME. He sought 100% additional test time over 5 days of testing (instead of 2), a private testing room, and the ability to use text-to-speech software. *Id.* ¶18. After thoroughly reviewing Wright's accommodation request and supporting documentation and also seeking the recommendation of an independent, external expert, NBME denied his request. *Id.* ¶¶29-30 and Exs. 9-10.

Wright took Step 3 a third time under standard testing conditions on October 21, 2019, and he did not pass. *Id.* ¶32.

On March 29, 2021, NBME received a new request for accommodations from Wright.  *Id.* ¶35.  This time, Wright sought 50% additional testing time, testing over 4 days, additional break time, and a separate testing environment.

NBME thoroughly reviewed Wright's second request and sought recommendations from two additional external experts.  *Id.* ¶48 and Exs. 24-25.  Based on its own thorough review and the experts' recommendations, NBME denied his request.  *Id.* ¶51 and Ex. 26.

### III.   Wright's Diagnoses, Evaluations and History of Accommodations

#### A.   2011 Diagnosis

Wright reports (but does not document) being diagnosed with ADHD in 2011, based solely on information he "verbally" provided in a "clinical interview."  *See* Declaration of Jason Wright ("Wright Decl.") ¶40.  He did not seek testing or academic accommodations in 2011 or in any of the immediately following years after purportedly receiving this diagnosis.  *See infra* pp.8-9.

#### B.   2017 Evaluation and Diagnosis

In September 2017, Wright sought a psychoeducational evaluation from Terri Lucero, Ph.D.  *See* McGeehan Decl. Ex. 3 p.1.  His intellectual functioning was measured using the WAIS-IV, and his scores were in the average to superior range.  *Id.* pp.3-7.  His academic achievement was measured by the WIAT-III, and his "overall performance across the various achievement domains … was in the High Average range and better than approximately 79% of his same age peers[.]"  *Id.* p.10.  He had certain subtest scores that Dr. Lucero described as "personal weaknesses," but all the scores were in the average to above average range.  *Id.*

Dr. Lucero found his oral reading comprehension as measured on the GORT-5 to be "significantly lower than expected" as "compared to his strong overall cognitive abilities."  *Id.*

p.11.  He earned the highest possible score on GORT-5 tests of reading rate, accuracy, and fluency. *See* Declaration of Marla Brassard, Ph.D. ("Brassard Decl.") ¶10.

Based solely on her assessments and her clinical interview (i.e., Wright's self-report), Dr. Lucero diagnosed Wright with a Specific Learning Disorder, with impairment in reading comprehension.  McGeehan Decl. Ex. 3 pp.13-14.  Her diagnosis was based on his *relative* weaknesses and his "lower than expected" performance *relative* to his strong cognitive abilities. *Id.* p.14.  Dr. Lucero did not diagnose Wright with ADHD, because he did not meet the diagnostic criteria.  *Id.* p.13.

### C.    2020 Evaluation and Diagnoses

Wright was also evaluated by Dr. Lucero in 2020.  Once again, his intellectual functioning was in the Superior range.  *Id.* p.3.  His academic achievement also feel in the average to above-average range where precise percentiles were reported.  *Id.* pp. 7-8.

Wright was also administered the Nelson Denny Reading Test.  Dr. Lucero reported his score on the Comprehension section of the test as falling at the 12th percentile, and his score on the Reading Rate test as falling at the 3rd percentile, McGeehan Decl. Ex. 16 p.9,[2] but those percentile measures are based on comparison to other college graduates, a cohort whose skills are more advanced than most people in the general population, *id.* Ex. 26 p.2; Brassard Decl. ¶¶14-

---

[2] The Nelson Denny reading rate test is "a one-minute test where [the person is] simply asked to place [his] finger on the spot where [he] finished reading."  *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *8 (E.D. Pa. 2016).

15.[3]  Putting aside other issues with the Nelson Denny, when more appropriate norms are used, Wright's Nelson Denny scores are in the average range.  Brassard Decl. ¶¶14-15.[4]

Wright and his mother completed CAARS ADHD questionnaires, with Wright self-reporting atypical symptoms and his mother reporting none, other than his "mildly atypical" self-concept.  McGeehan Decl. Ex. 26 p.10.  They also completed the BRIEF-A questionnaire, with Wright self-reporting "moderately elevated" issues relating to executive functioning and his mother reporting that he had average executive functioning skills.  *Id.* pp.11-12.

Wright took the IVA-2 CPT (continuous performance test), and his "combined sustained attention" score was at the 69th percentile, in the average range.  *Id.* p.12.

For this second evaluation, Dr. Lucero reviewed some of Wright's historical records.  She discussed Wright's ACT and SAT reports (where his scores were in the average range); a preschool evaluation (where he performed in the average range); score reports from standardized tests from 4th to 11th grade (which Dr. Lucero characterized as reflecting "a lot of variability," but with no reference to below-average or impaired performance); and records related to his performance in medical school and in his clinical rotations ("advanced").  *Id.* pp.3-4.

Under the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), "Specific Learning Disorder and ADHD are both considered neurodevelopmental disorders that first manifest in childhood.  Even if not formally diagnosed until later in life, each is characterized

---

[3] *See Doherty v. NBME*, 791 F. App'x 462, 464-65 (5th Cir. 2019) (unpublished) (finding it was "legal error" for district court to rely on Nelson Denny percentile scores that are based on other college educated students, not the general population, and reversing the lower court's preliminary injunction).

[4] Wright was also administered the Beery VMI "to screen for visual processing issues that might impact his reading speed."  He performed in the average range.  *Id.* p.9.

by persistent and impairing difficulties that interfere with functioning or development over a long period of time." McGeehan Decl. Ex. 11 p.2; *see also* Brassard Decl. ¶¶ 8-22; Murphy Decl. ¶8.

Notwithstanding the absence of objective evidence of clinically significant impairment or childhood onset, *see* Brassard ¶¶8-22; Murphy Decl. ¶22, Dr. Lucero diagnosed Wright with a Specific Learning Disorder, *see* McGeehan Decl. Ex. 16 p.15, relying on his performance on the non-diagnostic, one-minute Nelson Denny reading rate test (which was actually in the average range, when his performance is compared to a group closer to most people in the general population), a difference in Wright's performance on timed versus untimed reading tests (where he still scored in the average range on the timed tests), and WIAT-4 reading scores that she believed were "well below what would be expected of someone with superior verbal reasoning skills," *id.* pp.13-14.

Likewise, notwithstanding the absence of objective evidence of clinically significant impairment or childhood onset, *see* Murphy Decl. ¶¶ 8-21; Brassard Decl. ¶¶23-37, Dr. Lucero diagnosed Wright with ADHD, *see* McGeehan Decl. Ex. 16 p.15, relying on Wright's self-reported symptoms (while ignoring his mother's contrary report) and her finding that Wright was "susceptible to moments of severe distraction" based on his performance on the IVA-CPT (where his overall performance was in the average range), *id.* p.14. She did not explain why she changed her opinion from her 2017 report, where she (properly) concluded she could not diagnose ADHD based on lack of evidence of childhood onset.[5]

---

[5] Dr. Lucero also diagnosed Wright with Other Specified Depressive Disorder, *id*. p.15, but he did not rely on that diagnosis in seeking accommodations on the USMLE.

### D.      No History of Accommodations

Despite the fact that learning disorders and ADHD have childhood onset, Wright did not request or receive academic or testing accommodations in elementary, middle, or high school.  *See* McGeehan Decl. Ex. 13 p.5.  He did not request or receive accommodations on the ACT, SAT, GRE, or MCAT examinations.  *Id.* p.4.  He did not request or receive academic or testing accommodations in college, in his public health graduate program, or in medical school.  *Id.* p.5. Wright also took Step 1, Step 2 CK, and Step 2 CS of the USMLE under standard time conditions and passed each examination.  *Id.* ¶¶12-15.

The first time Wright reports requesting accommodations was in his one-year graduate program at the University of Denver, in 2019.  *Id.* Ex. 13 p.5.  One of the reasons he enrolled in this program was to obtain approval of an accommodation request that he could then submit to NBME to support his request for accommodations on Step 3.  *See* Wright Decl. ¶55.  Wright was approved to receive 50% additional testing time and alternative format textbooks.  *Id.* Ex. C.  He completed the program with a 4.0 GPA, and he states in his declaration:  "I was finally able to fully perform in a way that evinced my actual and advanced intellectual abilities with the addition of adequate and appropriate accommodations for my disabilities."  *Id.*  ¶58.  As Wright informed Dr. Lucero, however, "he never needed [the] extra time … because he did not have coursework that required timed testing."  *Id.* Ex. B p.3.  In other words, Wright's success in this graduate program was not attributable to receiving extra-time accommodations, because he never used them.

## **ARGUMENT**

### I.   **Preliminary Injunction Standard**

A preliminary injunction is an "extraordinary" remedy that should not be granted unless a plaintiff shows that the four prerequisite factors support the requested relief. *Winter v. NRDC*, 555 U.S. 7, 20, 22 (2008). A plaintiff must make a "clear and unequivocal showing" that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *State v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021).

The burden on Wright is even higher, because he seeks a mandatory preliminary injunction that would alter the status quo and award him all the substantive relief to which he would otherwise be entitled only if he were to prevail following a full trial on the merits.[6] Such injunctions are "disfavored and require a movant to satisfy a heightened standard." *Id.* at 883-84. Wright has not met this heavy burden.

### II.   **Wright Has Not Made A Clear And Unequivocal Showing That He Is Likely To Succeed On The Merits.**

Wright has not shown a likelihood of success on the merits. He has been diagnosed with a learning disability and ADHD. Neither diagnosis is supported by objective, real-world evidence. *See supra* pp.3-8. In all events, a diagnosis is not the same thing as a disability under the ADA.

---

[6] The only basis for Wright's preliminary injunction motion is his ADA claim, and the only relief available to Wright if he were to prevail on the merits of his ADA claim is injunctive relief. *See* 42 U.S.C. § 12188(a) (adopting the remedies set forth in 42 U.S.C. § 2000a-3(a)). In his complaint, he also asserts claims under the Rehabilitation Act and the Colorado Anti-Discrimination Act (CADA), for which damages can be awarded, but NBME is not covered by the Rehabilitation Act because it is not a recipient of federal financial assistance, and Wright cannot pursue a claim under the CADA because, among other things, he did not exhaust his administrative remedies. *See* C.R.S. § 24-34-306(14).

Wright must show that he is substantially limited in a relevant major life activity when compared to most people in the general population, and he cannot make that showing. Wright may believe that he would perform better with extra time or other accommodations (most people would), but that is not the purpose of the ADA.

A. **Disability Under the ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population.**

Pursuant to 42 U.S.C. § 12189,[7] persons who qualify as disabled under the ADA are entitled to reasonable accommodations, if needed, during test-taking.

According to Wright, "the ADA expressly asserts that one with a specific learning disability and/or ADHD is entitled to protection under the Act." Pl. Br. p.10. This is not correct. One of the regulations he discusses indicates that specific learning disabilities and ADHD are physical or mental impairments. *See* 28 C.F.R. § 36.105(b)(2). But having a diagnosed physical or mental impairment is not sufficient to establish a disability under the ADA. *See J.H. ex rel. J.P. v. Bernalio Cty.,* 806 F.3d 1255, 1261 n.4 (10th Cir. 2015) ("A learning disability alone does not necessarily trigger the protections of the [ADA].") (citations omitted); *Black v. NBME*, 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017) (finding medical school student diagnosed with ADHD was not disabled under the ADA).

To be disabled under the ADA, a person must have "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), "as compared to most people in the general population," 28 C.F.R. § 36.105(d)(1)(v). Thus, in evaluating whether Wright is substantially limited, his claimed limitations must be measured against the general

---

[7] 42 U.S.C. § 12112(b)(5)(A), Pl. Br. p.9, is from Title I of the ADA and does not apply here.

population, not against college graduates, other medical students, or his own expectations. *See, e.g., Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors….").

**B.      Wright Is Not Disabled Within the Meaning of the ADA.**

If a diagnosis is unwarranted, or if an impairment does not result in substantial limitations, the individual is not disabled under the ADA and is not entitled to accommodations.

Here, there is significant reason to question whether Wright meets the diagnostic criteria for either a learning disability or ADHD. *See supra* pp.3-8. Indeed, even Dr. Lucero acknowledged he did not meet the criteria for ADHD in her 2017 evaluation, changing course in her 2020 evaluation with no explanation why. *See* Murphy Decl. ¶16. In all events, the available documentation demonstrates that Wright is not substantially limited in his ability to read, think, concentrate, or perform any other major life activity relevant to taking the USMLE when he is compared to most people in the general population. Neither Wright nor Dr. Lucero address Wright's alleged functional limitations compared to the general population, which is a critical element of his burden of proof. He cannot prevail in the absence of such evidence. *See Russell v. Phillips 66 Co.*, 687 F. App'x 748, 754 nn.7, 8, 9 (10th Cir. 2017) (unpublished) (holding evidence showing plaintiff had been diagnosed with mental impairments by a Board-certified psychologist was not sufficient to establish a disability under the ADA, where there was no evidence he was substantially limited compared to most people in the general population).

Wright's psychoeducational testing does not reflect impaired functioning. *See supra* pp.4-8; Brassard Decl. ¶¶7-39; Murphy Decl. ¶¶17-20; McGeehan Decl. Exs. 11, 26; *see, e.g., Glueck*

*v. Nat'l Conf. of Bar Exam'rs*, 2018 WL 3977891, at *5 (W.D. Tex. Aug. 20, 2018) ("The evaluations show that Plaintiff performs in the 'low average' range in certain areas of mental functioning, and the evaluators' conclusions indicate that these present some challenges for Plaintiff, but Plaintiff fails to show that he is substantially limited as compared to the general population.") (citation omitted).

Wright also successfully moved through elementary and secondary school without any accommodations. *See* Wright Decl. ¶¶13, 17.  He performed well enough in high school to be admitted to college, and he graduated from college without any accommodations. *Id.* ¶19.  He also graduated from medical school with a 3.19 GPA and performed well in his clinical rotations without accommodations. *Id.* Exs. L-M.

Wright's performance on the ACT and SAT—again, without accommodations—also reflects average performance. *Id.* Exs. E-F.  His unaccommodated MCAT verbal scores are in the average range, compared to a highly select group of medical school applicants. *See* Brassard Decl. ¶16.  The fact that he has not been able to pass Step 3 of the USMLE, which is only taken by medical school graduates—another highly selective and capable group of individuals—bears no relevance to whether he is substantially limited compared to most people in the general population.

Individuals who perform at Wright's level in school and on timed standardized tests that require concentration, thinking, and extensive reading—with no extra testing time or other accommodations—are not substantially limited in their ability to read, think, or concentrate as compared to most people in the general population, and thus are not disabled under the ADA. *See, e.g., Black v. NBME,* 281 F. Supp. 3d at 1250-51 ("Of course, average (or above-average) performance presumptively establishes the absence of substantial limitation."); *Bibber*, 2016 WL

-12-

1404157, at *8 (finding that a plaintiff who scored in the "average" range on the GRE and the MCAT without accommodations was not substantially limited compared to most people); *Love v. Law Sch. Adm. Council,* 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA where, among other evidence, plaintiff had ACT and SAT scores "within the average range" with no accommodations, a 3.16 high school GPA, and did well in college without accommodations).[8]

Wright argues that NBME primarily focused on the outcome of his unaccommodated performance on Step 1 and Step 2 of the USMLE in denying his accommodation request in 2021. *See* Pl. Br. p.12.  This argument mischaracterizes NBME's decision letter, which explains many reasons for its decision (and does not mention the prior Step exams).  *See* McGeehan Decl. Ex. 26.

To the extent Wright challenges NBME's reliance on prior test "outcomes" more generally, the diagnostic criteria for specific learning disorders and ADHD, not to mention the ADA's "substantial limitation" analysis, all require a showing of impaired functioning, making real-world evidence important and proper.  *See, e.g., Palotai v. Univ. of Maryland*, 38 F. App'x 946, 955 (4th Cir. 2002) (unpublished) (noting report of plaintiff's psychologist did not compare his ability to learn with that of an average person in the general population and finding "[t]his deficiency is particularly crucial in  a case like this one in which the person claiming a significant limitation on his ability to learn has a demonstrated record of academic achievement....").

---

[8] Wright is not like the plaintiff in *Ramsay v. NBME*, 968 F.3d 251 (3d Cir. 2020), whose "reading, processing, and writing skills" were found to be "abnormally low by multiple [diagnostic] measures," and who received accommodations in college and medical school.  Wright's diagnostic scores are solidly average, and he successfully completed college and medical school without accommodations.  He is more similarly situated to the plaintiff in *Doherty v. NBME*, 791 F. App'x 462, 464-65 (5th Cir. 2019) (unpublished).

Wright references "guidance" from the Department of Justice outside the duly promulgated Title III regulations, which addresses "outcomes and grades."  Pl. Br. p.12.  This guidance does not change the text of the statute and regulations—which require a showing of substantial limitation compared to most people—and it simply states that Congress did not consider outcomes to be "definitive."  Such guidance, in any event, does not have the force of law, *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2012), and, as DOJ notes, the "Department's guidance documents … do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent."  Wright Decl. Ex. D p.9.  Wright's argument also ignores the fact that he and his evaluator likewise rely on "outcomes" to argue he is impaired (namely, that his standardized test performance purportedly does not match his high intellectual potential).

Wright also argues, incorrectly and again citing non-binding agency guidance, that "[t]he ADA effectively mandates that the NBME provide accommodations based on the recommendations from professionals, such as Dr. Lucero, who has provided two first-hand in-person evaluations of Mr. Wright[.]"  Pl. Br. p.10.  Nothing in the ADA or its implementing regulations requires NBME to defer to an examinee's supporting professional.  Wright also cites *D'Amico v. N.Y. State Bd. of Law Exam'rs*, Pl. Br. p.11, but in that case, unlike here, the Board did not challenge that the plaintiff was disabled and offered no contrary medical opinion.  813 F. Supp. 217, 223 (W.D.N.Y. 1993).

Wright argues that his "use of accommodations during his post-secondary education are to be accorded considerable weight,"  Pl. Br. p.11, but NBME has the right (and obligation) to make an independent assessment of Wright's request for accommodations on the USMLE.  *See Ware v.*

*Wyo. Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.,* 161 F.3d 19 (10th Cir. 1998).  And to the extent Wright's history of past accommodations informs the analysis, it undermines his claim.  Wright received ***no*** accommodations in primary school, secondary school, college, or medical school, or on any other standardized test.  The only time he has ever received accommodations is in a one-year graduate program at the University of Denver, and even there he did not use any of the accommodations he now seeks on the Step 3 examination.  *See supra* pp.8-9.

Wright has failed to show a likelihood of success on the merits.

### III.   Wright Has Not Made A Clear And Unequivocal Showing Of Irreparable Harm In The Absence Of Preliminary Injunctive Relief.

Wright's primary claim of irreparable harm, and the basis for his "emergency" motion, is his argument that he must take and pass Step 3 by November 11, 2021, because of Colorado Medical Board Rule 100.  *See* Pl. Br. p.13.  He appears to misinterpret the statute.  The ten-year time limit applies to applicants who are enrolled in a joint Ph.D./M.D. program.  3 CCR 713-17:100-17.2(D)(1).  Nothing in the record shows that Wright was enrolled in such a program.  Instead, it appears that Wright is subject to a **seven-year** time limit.  3 CCR 713-17:100-17.2(D).  To the extent there was ever an "emergency" to meet the deadline imposed by the Colorado Medical Board, it has long since passed.  A court does not issue a preliminary injunction to remedy past alleged harms.  *DTC Energy Grp. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).  And any such past harm would not be attributable to NBME, in any event.

Wright's claim of irreparable harm is also speculative.  As he acknowledges, the Board allows "good cause" exceptions to the time limit, *see* 3 CCR 713-17:100-17.2(D)(2), and the Board

may well provide Wright an exception.  *See Mahmood v. NBME*, 2012 WL 2368462, at *5 (E.D. Pa. 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives. For example, she does not discuss whether her school might grant her an extension of the seven-year requirement …."). "Such speculative assertions are insufficient to carry [Wright]'s burden[.]" *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) (citation omitted).

As a fallback, Wright invites the Court to "presume" irreparable harm based on an alleged "violation of the ADA."  Pl. Br. pp.12-13.  This argument improperly assumes that there has been such a violation.  There has not.  Indeed, there would not be any finding of a violation in connection with a *preliminary* injunction motion; the only issue at this very early stage is whether there is a strong likelihood of success on the merits.  Moreover, the law in the Tenth Circuit only allows the presumption of irreparable harm in the narrow circumstance where injunctive relief is mandated for a statutory violation.  *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141, 1143 (10th Cir. 2017).  The statutory provision addressing relief for ADA Title III cases uses permissive, not mandatory, language, and does not mandate relief. *See* 42 U.S.C. § 12188(a); § 2000a-3.  It does not provide an unequivocal statement that irreparable harm can be presumed.  *See Fish v. Kobach*, 840 F.3d 710, 751 n.24 (10th Cir. 2016) (statutory language that "simply lays out time periods in which an aggrieved person may bring suit for either declaratory or injunctive relief" does not limit the courts' traditional equitable discretion").  As shown by scores of ADA Title III cases in which the irreparable harm factor is appropriately included as part of the required analysis, irreparable harm is not presumed. *Cf. Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 125 (10th

Cir. 2004) (unpublished) ("While we recognize that 'Congress may intervene and guide or control the exercise of the courts' discretion' regarding how injunctions are issued for violations of federal statutes, our circuit precedent does not make it clear that Congress did so through the ADA.") (declining to resolve the issue, and finding the balance of harms favored the testing company).

Wright also argues there is irreparable harm because he will be delayed in pursuing his chosen profession. *See* Pl. Br. p.13. Wright, however, has not demonstrated any sense of urgency in "pursuing his chosen profession." He had one year off between his first and second medical residencies, *see* Wright Decl. ¶37, at which time he could have studied for and taken Step 3, but he did not do so. After he did not pass Step 3 the second time (in November 2017), he waited until October 2018 before requesting accommodations on the examination, and then did not register for the examination until May 2019, which delayed a decision on his request. *See* McGeehan Decl. ¶¶27-28. After NBME denied his first request, he took nine months to submit another request for testing accommodations, and in the interim, he pursued another year-long graduate degree. *Id.* ¶¶30, 35; Wright Decl. ¶55. Although he threatened litigation against NBME in 2019, McGeehan Decl. ¶33, he did not bring this lawsuit until August 2021 (two months after NBME denied his second accommodation request), *id.* ¶51, and did not file his "emergency" preliminary injunction motion until approximately two weeks later. All of this happened in the face of a deadline under the Colorado Medical Board Rules that he has now missed by years. Although "'there is no categorical rule that delay bars the issuance of an injunction,' an unreasonable delay—like waiting more than twelve months ... certainly counsels strongly against it." *SEBO Am., LLC v. K&M Housewares & Appliances Inc.*, No. 20-cv-03683-DDD-NRN, 2021 WL 1329077, at *2 (D. Colo. Mar. 18, 2021) (citation omitted).

Finally, Wright has asserted causes of action that claim "actual monetary damages" for his alleged injuries. *See* Compl. ¶83 (Rehabilitation Act), ¶101 (CADA), Prayer for Relief (seeking damages). Although NBME disputes that Wright is entitled to any relief, including a monetary award, Wright is seeking damages if he ultimately prevails at trial, contrary to his claim of irreparable harm. *See DTC Energy*, 912 F.3d at 1270 ("[T]he movant 'must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'") (citations omitted).

## IV.    A Preliminary Injunction Would Harm NBME.

Wright argues that any harm to NBME if an injunction issued would be "negligible," because NBME approves extended testing time for other test takers. Pl. Br. p.15. Wright misses the important point. NBME has a strong and legitimate interest in ensuring that the USMLE program is fair to all examinees. *See Powell v. NBME*, 364 F.3d at 88-89. NBME, as well as other examinees—both disabled and non-disabled—are therefore harmed if an examinee tests with unwarranted accommodations. And once scores are reported to medical licensing authorities, the harm cannot be undone. Wright argues "it has been held that the threatened injury to the student outweighs any damage that granting the preliminary injunction might cause to the NBME or other licensing entities or to the public," Pl. Br. p.13, citing a Texas district court case, but the Tenth Circuit has held otherwise. *See Rothberg*, 102 F. App'x at 125 (finding balance of harms weighed in favor of testing entity where the examinee would experience a delay in her education plans, but the harm to the testing entity was permanent). The potential harm to NBME if it is ordered to provide unwarranted accommodations outweighs any speculative harm to Wright from not being able to test in October with accommodations.

V.      **An Injunction Would Not Serve The Public Interest.**

Wright argues that the public interest is "clearly" served by granting injunctions that eliminate the type of discrimination targeted by the ADA.  Pl. Br. p.16.  His argument, however, is based on the incorrect premise that he is disabled under the statute and likely to succeed on the merits of his claim.

Moreover, "[a]lthough the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests."  *Bach v. LSAC*, 2014 U.S. Dist. LEXIS 124632 at *7-8 (M.D.N.C. 2014).  Other candidates do not want extra time to be granted to individuals who are not disabled, as that could provide an advantage that is denied to other test takers.  Nor do score users want unwarranted accommodations to affect the resulting scores.  This is particularly true in the context of licensing examinations that help protect the public welfare—in this instance, by helping to ensure that licensed physicians have the minimum competencies to deliver safe and effective healthcare services.

Any doubts regarding Wright's entitlement to accommodations should be resolved against an award of such accommodations by way of the "emergency" motion he has filed seeking a mandatory preliminary injunction.

<u>**CONCLUSION**</u>

Wright's motion for preliminary injunction should be denied.

DATED this 24th day of September, 2021.

154015932.2

Respectfully submitted,

**PERKINS COIE LLP**


By: s/ *Lindsey E. Dunn*
     Lindsey E. Dunn, #49547
     LDunn@perkinscoie.com
     1900 Sixteenth Street, Suite 1400
     Denver, CO 80202-5255
     Telephone: 303.291.2300
     Facsimile: 303.291.2400

     Robert A. Burgoyne (*application for
          admission to bar forthcoming*)


**Attorneys for Defendant, National Board of Medical Examiners**

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(2).

154015932.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2021, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following e-mail addresses:

- Eric H. Maxfield
  eric@ericmaxfieldlaw.com,Eric@ericmaxfieldlaw.com
  emaxfieldlaw@yahoo.com

s/ *Lindsey E. Dunn*
Lindsey E. Dunn
LDunn@perkinscoie.com
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303.291.2300
Facsimile: 303.291.2400

**Attorneys for Defendant, National Board of Medical Examiners**

154015932.2