IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02319

JASON WRIGHT,

        Plaintiff,

v.

NATIONAL BOARD OF MEDICAL EXAMINERS,

        Defendant.

## DECLARATION OF MARLA R. BRASSARD, PH.D.

1. My name is Marla R. Brassard. I am over eighteen (18) years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein in my capacity as an external reviewer for the National Board of Medical Examiners ("NBME").

2. In April of 2021, I was asked to review the file of Dr. Jason Wright for test accommodations on the USMLE Step 3 exam. The candidate requested additional break time and time and a half over four days as well as a separate, quiet testing environment free from typical distractions. He reported that he was diagnosed in 2008 with Other Specified Depressive Disorder (DSM-5-311), in 2011 with Attention Deficit/Hyperactivity Disorder (ADHD) inattentive type (DSM-5-314.00), and in 2017 with Specific Learning Disorder (SLD), reading impairment (DSM-5-315.00).

3. This was Dr. Wright's second request for test accommodations on the USMLE Step 3 exam. I did not evaluate his initial request. It is my understanding that he originally applied for

153936226.1

test accommodations on Step 3 in 2018 and his request had been denied. The documents I reviewed were the documents he submitted in connection with both the original and the second request.

4.  I provided my recommendations to NBME by letter dated April 10, 2021. A true and correct copy of that letter is attached at **Exhibit 1**. In that letter, I concluded that Dr. Wright had not adequately supported his request for test accommodations based on either a reading disorder or ADHD. Because his documentation was not consistent with either diagnosis, I did not recommend that NBME grant him additional testing time. With respect to Dr. Wright's request for a quiet testing environment, I noted my impression that the testing centers the NBME uses for exams provide very quiet environments and there is the option to use noise cancelling headphones. Given that Dr. Wright reported to Dr. Lucero that he has extra anxiety when he feels time is running out on the Step 3 exam, I suggested that he might benefit from the Board's extra break platform, which could be offered as a courtesy (not as an official testing accommodation). To be clear, it is my opinion that Dr. Wright has not shown that any testing accommodation is warranted here based on his claimed impairments.

5.  My opinions are expressed to a reasonable degree of professional scientific certainty based on my knowledge and experience:

    a.  I am a licensed psychologist, certified school psychologist, and Fellow of the American Psychological Association.

    b.  I have been a professor in Ph.D. and master's degree programs in School Psychology accredited by the American Psychological Association and the National Association of School Psychologists for forty years. I am currently professor emerita at Teachers College, Columbia University. I have taught

153936226.1

        graduate courses in individual psychological assessment and diagnosis for preschool into mid-adulthood patients, including evidence-based test accommodations and the psychometric foundation for individual tests, and I have supervised the comprehensive psychoeducational assessment of hundreds of individuals ages 3 to 50 in university training clinics.

   c.   For twenty-nine years, I have served as a consultant to high-stakes testing agencies (e.g., New York State Bar Examiners, the National Board of Medical Examiners) on applicant requests for test accommodations under the Americans with Disabilities Act ("ADA"), in cases in which candidates seek accommodations based on neurodevelopmental and mental health disorders.

   d.   I have spent almost three decades in private practice, including serving as an expert witness in cases involving child maltreatment, child and family development, and neurodevelopmental disorders.

   e.   For five years, I worked as a school psychologist for children ages 18 months to 21 years.

   f.   I am the co-author of a graduate textbook in individual assessment and diagnosis (Brassard & Boehm, 2007).

   g.   I have maintained an active research career in child maltreatment, high-risk parenting and neurodevelopmental disorders, authoring four books and seventy-six professional articles and chapters.

6.   A true and correct copy of my current CV is attached at **Exhibit 2**.

<u>Specific Learning Disorder with impairment in Reading (DSM-5-315.00)</u>

-3-

153936226.1

7. Using the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, known as DSM-5, it is my opinion that Dr. Wright does not meet diagnostic criteria for Specific Learning Disorder with impairment in reading comprehension or reading fluency.

8. The DSM-5 sets forth four diagnostic criteria for a Specific Learning Disorder.

9. Criterion A, with respect to an impairment in reading, requires difficulties learning and using academic skills, as demonstrated by at least one of the following symptoms that have persisted for at least 6 months, despite the provision of interventions that target those difficulties: (1) inaccurate or slow and effortful word reading (e.g., reads single words aloud incorrectly or slowly and hesitantly, frequently guesses words, has difficulty sounding out words; or (2) difficulty understanding the meaning of what is read (e.g., may read text accurately but not understand the sequence, relationships, inferences, or deeper meanings of what is read).

10. The only objective evidence submitted by Dr. Wright relating to his speed or level of effort in word reading is Dr. Lucero's assessment reports. Dr. Wright's diagnostic tests, however, do not reflect slow or effortful word reading. On the Weschler Individual Achievement Test, 3rd Edition (WIAT-III) discussed in the 2017 report, his word reading was 112 (79th percentile), pseudoword decoding was 111 (77th percentile), oral word fluency was 117 (87th percentile), and his oral reading fluency cluster was 99 (47th percentile), all solidly average to above average. On the Gray Oral Reading Test – Fifth Edition (GORT-5) his reading rate, accuracy and fluency were at the ceiling of the test for grade 13 (meaning that he earned the highest possible score on the test). In Dr. Lucero's 2020 report Dr. Wright's reading composite score on the WIAT-IV was 110 (75th percentile), decoding composite score was 103 (58th percentile), and reading fluency composite score was 103 (58th percentile). These scores are again solidly average and very

similar to those obtained in 2017, where the total reading composite score on the WIAT-III was 108 (average).

11. In her 2020 report, Dr. Lucero describes Dr. Wright's scores on the oral reading accuracy and oral reading rate subtests on the WIAT-IV as below average for his age, falling somewhere below the 25th percentile. Because the test was constructed to classify oral reading accuracy and rate scores into quartiles (e.g., first quartile was 1st to 25th percentile, second quartile 26th to 50th percentile, third quartile 51st to 75th percentile, and fourth quartile above the 75th percentile), Dr. Wright's score in the first quartile could be solidly average to below average. Scores within the 16th to 25th percentile are within the average range — only scores at the 1st to 15th percentile are below average for Dr. Wright's age. Thus, there is no way of knowing precisely how he performed within the first quartile. Notably, in 2017, Dr. Wright's scores on those same subtests on the WIAT-III were average, falling at the 49th (or 47th percentile, as the scores on pp. 8 and 10 of Dr. Lucero's report differ) and the 50th percentile, respectively, for oral reading accuracy and oral reading rate.

12. In her 2017 report, Dr. Lucero opined that Dr. Wright had "significant weaknesses in his overall oral reading fluency and math fluency performances," but acknowledged that this "weakness" was only relative to "his own well-developed cognitive abilities." His oral reading fluency score on the WIAT-III in 2017 was in the solidly average range.

13. In her 2020 report, Dr. Lucero states, "[t]here was an obvious difference in [Dr. Wright's] performance on untimed reading tasks on the WIAT-4 and timed reading tasks on the WIAT-4 and NDRT, particularly when the reading involved longer passages to answer comprehensive questions." (Report at 13) She specifically points to his timed score on the WIAT-

153936226.1

IV Oral Reading Fluency task (30th percentile) and his untimed Reading Comprehension score (75th percentile) on the WIAT-IV. These scores are both solidly average and indicate that when timed reading aloud his fluency was at the 30th percentile, while when reading untimed silently he was at the 75th percentile. It is not uncommon for oral reading and silent reading rates to differ. What is relevant here is that both scores were average, and Step 3 involves silent reading.

14. Dr. Lucero also points to his Nelson Denny Reading Test (NDRT) Reading Comprehension score rising from the 12th percentile to the 68th percentile under extended time conditions. There are a few things to note about his performance on the NDRT Reading Comprehension test. First, Dr. Lucero used percentile scores to interpret Dr. Wright's performance on the NDRT, which is problematic, because the percentile scores compare his performance to other college graduates, which is a much more competitive group than the average person in the general population. Instead, NDRT scale scores are the appropriate metric to use since they are based on the pooled norms for grades 10 to 14 and they have been found to be a very good proxy for age norms. His NDRT Reading Comprehension scale scores for the pooled norms were 207 (average, a little above the 50th percentile) for standard timed reading comprehension and 241 (above average) when given extended time. Second, the extended timed norms on the NDRT Forms G/H were developed "using students whose teachers considered them to be disadvantaged readers and/or students for whom their teachers felt more testing time could provide a more accurate estimate." (NDRT Form G/H manual, p. 5). Thus, NDRT extended time scores are not relevant for diagnostic proposes as they are based on an atypical population. Third, even if the extended time norms were valid, most people can earn higher scores when given extra time unless they earn a perfect score under timed conditions. In sum, Dr. Wright's timed and untimed reading

comprehension scores are solidly average and consistent with his performance on the timed reading sections of the high stakes exams he took in high school and later, graduate school.

15.     Dr. Lucero also relies on Dr. Wright's reading rate score on the NDRT. At the outset, it should be noted that the reading rate test on the NDRT is an unreliable measure based on data reported in the test manual. The reading rate is based on the test-taker placing a finger on the place reached in the comprehension test after the first minute of a 20-minute reading test. Research shows that many individuals start reading new material at a slower rate than normal during the first few minutes to assess the difficulty of the text and then adjust their reading rate accordingly (Carver, 1992). Also, as discussed above, Dr. Lucero used percentile scores to interpret Dr. Wright's performance on the NDRT, comparing his performance to other college graduates, rather than the scale scores based on pooled norms for grades 10 to 14 that have been found to be a very good proxy for age norms. The pooled norms have a mean of 200 and a standard deviation of 25. Thus, while Dr. Lucero reports Dr. Wright's score on the reading rate test as being at the 3rd percentile "compared to his peers," his reading rate score of 175 (which, again, is based on an unreliable, non-diagnostic measure reflecting one minute of reading), is at the bottom of the normal range based on pooled norms.

16.     The available documentation also does not reflect that Dr. Wright experiences any difficulty with reading comprehension. Dr. Wright is remarkably consistent in performing in the average range, and, in a few instances, above average, on standardized measures of reading comprehension. These measures include both high stakes exams such as the SAT (reading 25th, 32nd, and 35th percentiles relative to college bound high school students, a group that is more advanced than most people in the general population), the ACT (reading 34th and 42nd percentiles

-7-
153936226.1

relative to college bound high school students), the GRE (verbal 45th percentile relative to graduate school applicants, an even more advanced group), and the MCAT (verbal reasoning scores at the 15th to 27th percentiles relative to medical school applicants, another advanced group), as well as the diagnostic tests of reading comprehension reported by Dr. Lucero in 2017 and 2020 (reading composites at the 70th to 75th percentiles relative to age peers in the general population – the reference group used by DSM-5 and the ADA for disability determinations).

17. <u>Criterion B</u> requires that the individual's affected academic skills are substantially and quantifiably below those expected for the individual's chronological age, and cause significant interference with academic or occupational performance, or with activities of daily living, as confirmed by individually administered standardized achievement measures and comprehensive clinical assessment. For individuals aged 17 and older, a documented history of impairing learning difficulties may be substituted for the standardized assessment.

18. Dr. Wright did not submit any documentation relating to his early academic history, but the records he did submit do not show academic skills that are substantially and quantifiably below those expected based on his age, or that caused significant interference with academic or occupational performance or with activities of daily living. Rather, his records show highly consistent average achievement on high stakes exams in high school and later the MCAT and GRE. The standardized achievement measures administered by Dr. Lucero also do not show impaired academic skills – all scores are average to high average except for the unreliable NDRT reading rate in 2020, which was at the low end of the average range. Dr. Wright does not have a documented history of learning difficulties.

-8-

19. <u>Criterion C</u> requires that the learning difficulties begin during school-aged years, although they may not become fully manifest until the demands for those affected academic skills exceed the individual's limited capacities. Reading disability is a neurodevelopmental disorder that manifests early in elementary school. Most children have reading comprehension problems because of inefficient word identification. Others master word identification but have impaired reading comprehension that becomes apparent in later elementary school because of low intellectual ability or poor knowledge of the language of instruction (e.g., English language learners). Dr. Wright has not provided objective evidence of such a history. In her 2020 report, Dr. Lucero quotes from an age 5 evaluation where his performance on verbal tests was average, although this was thought to be an underestimate by the examiner. Dr. Lucero's 2017 report reflects that Dr. Wright reported he first began "to experience academic difficulties in middle school but acknowledges that poor choices in peers and behaviors further complicated his academic performance." In my opinion, this is not a description of behavior compatible with a reading disability, but rather, a suggestion of poor performance due to engaging in behavior incompatible with doing well in school. From high school on, there is a clear record of academic competence in reading, math, and science based, among other things, on his ACT and SAT scores and his successful completion of college and medical school without accommodations.

20. <u>Criterion D</u> requires that the learning difficulties are not better accounted for by intellectual disabilities, uncorrected visual or auditory acuity, other mental or neurological disorders, psychosocial adversity, lack of proficiency in the language of academic instruction, or inadequate educational instruction. Dr. Wright's file provides evidence of intact cognitive ability (IQ scores in 2017 and 2020 at the 91st to 92nd percentile), seemingly adequate vision and hearing

(no problems were reported), no history of mental or neurological disorders known to disrupt or better account for learning difficulties, no social adversity reported (a middle to high SES background is estimated based on parental occupation of physician and nurse), average to above average knowledge of the English language (verbal comprehension indices on the WAIS-IV), and likely adequate educational instruction as Dr. Wright was competent in reading, science, and math by late high school as seen in his SAT and ACT scores.

21. DSM-5 notes that all "four diagnostic criteria are to be met based on a clinical synthesis of the individual's history (developmental, medical, family, educational), school reports, and psychoeducational assessment" (DSM-5, p. 67). Importantly, this is different than coming to a diagnostic conclusion solely based on an evaluation conducted on one or more days in a psychologist's office, especially in a context where the evaluation is conducted to request accommodations and there are incentives for not doing one's best. The available objective data for Dr. Wright demonstrate competence in reading, not severe impairment.

22. I carefully reviewed the documentation submitted by Dr. Wright in support of his testing accommodation requests, including the most recent evaluation from Dr. Lucero in 2020. I did not find any objective evidence of a childhood onset of reading disabilities. Dr. Wright has a documented history of average reading abilities on unaccommodated standardized exams relative to competitive peers (i.e., college bound applicants, medical school applicants, graduate school applicants, other medical school students), a more competitive and talented group than the average person in the general population. For some reason, Dr. Wright is having difficulty with the Step 3 examination, and he has failed the Step 3 examination on three occasions. He reports that he is calm and well prepared when he enters the exam but gets anxious when he feels that time is running

out. His Step 3 score reports show deficits in many knowledge areas. However, the evidence is clear his failure is not based on a reading disability that limits his ability to access the test content.

<u>Attention Deficit Hyperactivity Disorder (ADHD) inattentive type (DSM-5-314.00)</u>

23. The DSM-5 sets forth five diagnostic criteria for ADHD.

24. <u>Criterion A</u> requires "a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development, as characterized by" at least six symptoms (five for older adolescents and adults ) "that have persisted for at least 6 months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupation activities." It then lists nine symptoms of inattention and nine symptoms of hyperactivity and impulsivity.

25. Dr. Lucero diagnosed Dr. Wright with ADHD in her 2020 evaluation, but she did not list which symptoms, if any, were clinically significant and persistent for Dr. Wright.

26. To assess for ADHD, Dr. Wright was given the Conners' Adult ADHD Rating Scale Self-Report (CAARS). His 2020 scores placed him in the moderately atypical range for inattentive symptoms (T score of 69). He was markedly atypical on problems with self-concept (T=70). His mother filled out the observer rating scale, and her ratings were within the average range.

27. Similarly, on the Behavior Rating Inventory of Executive Functioning, Adult Version (BRIEF-A), Dr. Wright rated himself moderately elevated on the global executive composite (T score of 66, 96th percentile) and on the behavior regulation index (T score of 65, 95th percentile). His mother's ratings placed him within the average range.

28. Observer reports are considered more valid than self-reports for ADHD, especially when observers have a high degree of contact with the person being rated.

29. Sometimes continuous performance tests (CPT) are administered to assess for problems with attention. CPTs are not diagnostic of ADHD but do identify attention problems, which can be caused my many disorders and current mental states, including ADHD. On the Integrated Visual and Auditory Continuous Performance Test, 2nd Edition (IVA-2), there were no indications of feigned impairment, and Dr. Wright performed well on the computerized performance test. Dr. Lucero states there was "evidence of notable distractibility during auditory attention tasks," but Dr. Wright's auditory attention score was at the 62nd percentile (average), while his full-scale response control was in the above average range, his auditory response control was at the 86th percentile, and his visual attention was in the superior range at the 90th percentile. His overall combined sustained attention score was at the 69th percentile, in the average range. Dr. Lucero references two minor measures as being problematic within the auditory attention scale – auditory vigilance at the 4th percentile and elasticity at the 1st percentile – but this is in the context of a good performance that does not resemble the profile of individuals with attention problems.

30. ADHD is a neurodevelopmental disorder that is diagnosed based on documented history of childhood onset of behavioral symptoms that impair functioning, often across the lifespan. These symptoms can be seen in documents such as report cards, behavior rating scales completed by teachers and parents, medical records for routine pediatrician visits or emergency room visits for accidents, special education records, and psychoeducational evaluations. Psychoeducational evaluations are used to rule out alternative explanations for the behavior symptoms and to identify any co-morbid conditions (e.g., learning disability, behavior problems).

153936226.1

When ADHD is evaluated in adulthood these early records are critical. Research has shown that ADHD is easily misdiagnosed if self-report of symptoms alone is used for diagnosis.

31. Under Criterion B, several inattentive or hyperactivity-impulsive symptoms must be present prior to the age of 12. In 2017, Dr. Lucero did not diagnosis Dr. Wright with ADHD because issues with inattention and focus had not been present since childhood and she thought that any issues of inattention were secondary to what she concluded was a reading disability. She diagnosed Dr. Wright with ADHD in 2020, however, she did not explain the basis for her change of opinion.

32. Dr. Lucero might have relied on a preschool evaluation from when Dr. Wright was five years old, which showed "constant physical movement, fatiguing easily over the course of the testing session and often responding with 'I forgot' which was interpreted by the examiner that he was uptight during the examination and that it negatively impacted his performance on verbal subtests although his performance was average." Saying "I forgot" infrequently during a testing session is too vague a reference to classify as a symptom of inattention (the most relevant would-be symptom is Symptom 1i: "often forgetful in daily activities (e.g., doing chores, running errands; for older adolescents and adults, returning calls, paying bills, keeping appointments"). Constant physical movement is a symptom of hyperactivity (DSM-5 Symptom 2a: "fidgets with or taps hands and feet or squirms in chair"). *One* symptom of hyperactivity on one occasion, especially when observed during a highly stressful situation, does not demonstrate childhood onset of ADHD.

33. Dr. Lucero also states that she reviewed results from the Iowa Test of Basic Skills and other standardized exams taken by Dr. Wright from 4th through 11th grade, which revealed a lot of variability in his performance, but she does not report what that variability was or report the

153936226.1

scores so that they could be independently reviewed. She attributes this variability to ADHD. ADHD, however, is not related to cognitive and academic problems unless there are co-occurring learning disabilities. Thus, Dr. Wright's documentation provides no objective evidence of childhood onset of this disorder, which would be expected to be reflected in historical documents such as report cards (teacher comments), early evaluations, special education records, or medical records reflecting pediatric visits, as discussed above.

34. Under Criterion C, several of the symptoms of inattention must be present in two or more settings, such as home, school, work or with friends and relatives. Dr. Wright's documentation provided no evidence of impact in multiple settings. There are no teacher or other school reports discussing Dr. Wright's behavior in school during childhood and the work evaluation that he submitted did not reflect any difficulties with attention. In fact, he achieved an official commendation for demonstrating professionalism and self-responsibility in medical school, behaviors that are typically inconsistent with ADHD inattentive type symptoms (e.g., doesn't follow through on instructions or fails to finish work, poor organization of tasks and activities, makes careless mistakes), and he did not submit any other documentation suggesting symptoms of inattention in other settings (e.g., traffic tickets, a pattern of late bill paying). In terms of his interactions with friends and relatives, the only information we have are his mother's ratings of him during his 2017 and 2020 evaluations; they were within the average range.

35. Under Criterion D, there must be "clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning." Dr. Wright has not submitted any objective evidence of past or current clinically significant impairment in school, occupation, or social relationships aside from his dismissal from his medical residency because he

had not passed the Step 3 exam. Dr. Wright has not been able to pass the Stem 3 examination, a very difficult professional examination, but passing this one examination is not a major life activity, and very, very few members of the general population could pass this examination.

36.     Finally, under Criterion E, the symptoms should not occur exclusively during the course of schizophrenia or another psychotic disorder or be better explained by another mental disorder. Dr. Wight did not claim depression as a disability in his request for test accommodation in 2017 but does list it as a diagnosis given in 2008 on his 2020 application. Dr. Lucero reported in 2020 that he was taking an antidepressant (Paroxetine 20mg daily) for depression and lists Other Specified Depressive Disorder as a diagnosis (DSM-5 311.00), even though she did not perform an evaluation of his emotional functioning beyond administering a symptom checklist. On the Symptom Checklist 90, Revised, he endorsed mild symptoms of depression and some symptoms of anxiety. *Severe* depression does interfere with concentration and effortful mental work (e.g., test taking, practicing a profession). Even if Dr. Wright met criteria for depression when evaluated in 2020, his evaluation demonstrated competent mental functioning across the board, consistent with his ACT, ACT, GRE, MCAT, and 2017 evaluation scores, indicating that whatever depressive symptoms he had in 2020, they were not severe and did not rise to a level that it interfered with his ability to access the Step 3 exam.

37.     In her 2020 evaluation, Dr. Lucero reported that Dr. Wright felt that the medication he was taking was helpful with his concentration, but that he still struggles in retaining information he has read and in completing exams within the allotted time. Many people with and without ADHD, however, find that stimulant medication improves concentration, and high percentages of

-15-

college students with and without disabilities have reported wanting extra time, extra breaks, and a separate room for exams (Lewandowski, Lambert, Lovett, Panahon, & Sytsma, 2014).

38.  In both of Dr. Lucero's evaluations, she discussed "Twice Exceptional" individuals, that is, people who are both intellectually gifted and have a disability such as a learning disability (LD), sensory or physical disability. In the present context, the same concept is often referred to as "gifted/LD" or "GLD." Reviews of the research literature have found no consistent definition of the gifted/LD category and no reliable means of identification (Gilman et al., 2013; Lovett, 2013; Lovett & Sparks, 2010; Maddocks, 2018; McCosh, Kehle, Bray & Siegle, 2001). Indeed, Dr. Lucero claims that the two conditions (giftedness and LD) mask each other and thus can't be identified reliably without special training. The varying proposed definitions of gifted/LD, including Dr. Lucero's, are not compatible with DSM-5 criteria for a learning disorder. Most rely on an inherently unreliable discrepancy analysis of strengths and weakness in cognitive and achievement scores, identifying as disabled individuals with average academic skills and high IQs. DSM-5 Specific Learning Disorder criteria require "substantially and quantifiably" well below-average academic skills for one's chronological age (a standard score of 80, 9th percentile, and below) that "cause significant interference with academic or occupational performance or with activities of daily living" (DSM-5, p. 67). IQ is only used in the DSM-5 diagnosis of SLD to rule out intellectual disability (formerly known as mental retardation). Someone can have both intellectual giftedness and LD, but the person would need to independently meet the separate criteria for each condition. Dr. Wright does not meet criteria for SLD and marginally meets it for gifted. He has solidly average achievement across measures and time and his IQ falls in the intellectual bright but not gifted range (traditional criteria for giftedness are an IQ of 130 and

above, 98th-99th.9 percentile, although some school districts also include the intellectually bright with IQs of 120-129, 91st to 97th percentile).

39.     In conclusion, I find little in Dr. Wright's documentation to support his request for test accommodations based on either a reading disability or ADHD. His documentation is not consistent with either diagnosis. It is also my opinion that Dr. Wright's documentation does not show that he is substantially limited compared to most people in the general population with respect to any major life activity relevant to taking Step 3 of the USMLE.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2021.

*Marla Brassard*
Marla R. Brassard