# EXHIBIT 1

# Marla R. Brassard, Ph.D.
96 Van Wies Point Drive
Glenmont, New York 12077
(518) 449-7317

April 10, 2021

Catherine Farmer, Psy.D.
Director of Test Accommodations
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Dear Dr. Farmer:

     I am writing you in regard to the request of Dr. Jason Wright for test accommodations on the USMLE Step 3 exam. The candidate is requesting additional break time and time and a half over four days as well as a separate, quiet testing environment free from typical distractions. He reports that he was diagnosed in 2008 with Other Specified Depressive Disorder (DSM-V-311), in 2011 with Attention Deficit/Hyperactivity Disorder (ADHD) inattentive type (DSM-V-314.00), and in 2017 with Specific Learning Disorder (SLD), reading impairment (DSM-V-315.00). In regard to prior test accommodations, the candidate denies having received them on the SAT/ACT in 1994, on the MCAT in 2004 and 2005, and on the GRE in 2006. He also reports that he took and failed two Comp Step 1's in 2011 and then passed the third. He reports passing the USMLE Step 1 in 2011, failed and then passed USMLE Step 2 Clinical Knowledge in 2013, and that he failed the Step 3 exam three times. He notes that he had requested test accommodations on Step 3 in 2019 but they were denied by the NBME. In terms of prior test accommodations, he denies having received any from elementary through medical school but reports that in 2019-2020 he received them in a master's program at the University of Denver in the form of time and a half and an alternate format test.

     His file includes his original request for test accommodations in 2018 where he requested double time over five days for ADHD, inattentive type, and a SLD in reading; his original personal statement which details his struggles passing the Step 3 exam and how that caused him to be terminated from his residency; SAT scores taken on three occasions showing verbal scores between the 25th and 35th percentile relative to college bound high school students and math scores between the 41st and 59th percentile; ACT scores taken on two occasions showing that his overall reading score was at the 34th percentile and his composite score at the 35th percentile and on the second administration his reading score was at the 42nd percentile and composite at the 59th percentile. Also enclosed in his documentation is part of his American Association of Medical Colleges application showing his MCAT scores on two occasions as well as his scholarships; a copy from his high school listing his SAT and ACT scores; a GRE score report showing that in 2006 his verbal score relative to other graduate school applicants was at the 45th percentile, quantitative at the 35th percentile, and writing at the 51st percentile; MCAT score report from 2005 showing that his composite score was at the 14th to 17th percentile relative to

- 1 -

Catherine Farmer, Psy.D.
RE: Dr. Jason Wright
April 10, 2021

highly competitive medical school applicants with his verbal reasoning score at the 38th to 53rd percentile and writing score at the 58th to 71st percentile.

Also enclosed in the documentation is a medical school performance evaluation from August 2013 which was very strong; a University of Denver eligibility notification for extended time on tests dated September 2019; score reports for Step 1 showing that he passed with a score of 226 with a pass score being 188, a very strong result; a score report for Step 2 clinical skills, pass; a score report for Step 2 Clinical Knowledge, pass at 212 when a score of 203 is required; Step 3 score report for April 2017 showing a fail where the candidate earned a 168 and 196 is required to pass; a November 2017 Step 3 report showing a fail where the candidate received a score of 182; and a October 2019 Step 3 score report a test of 180. There is also a University of Colorado transcript showing a degree in public health with a GPA of 3.6 (very faint print, I could not find a year of graduation); a Ross University School of Medicine transcript showing that the candidate graduated with a GPA of 3.19 in March 2014; a psychoeducational evaluation performed in September and October 2017; and the Board's letter dated July 2019 denying the candidate's request for test accommodations. In the letter, the Board refers to the 2017 psychoeducational evaluation where his expert did not believe he met criteria for ADHD. In regard to his statement that he has a reading disability, the letter also noted that all of his reading scores were in the average to above average range in the 2017 evaluation. The Board also notes that Specific Learning Disabilities and Attention Deficit/Hyperactivity Disorder are neurodevelopmental disorders that manifest in childhood and that, even though the applicant did not submit academic records for review, his August 2013 medical school performance evaluation included information about his educational history stated that he performed at a highly satisfactory level in the basic sciences, earned a very good Step 1 score, was outstanding in his clinical performance, completed all of his courses without remediation, and in general, remarked on how he was hard working, bright, and would make an excellent physician, all without receipt of test accommodations.

The candidate now comes before the Board with new documentation which includes a new personal statement; an attorney letter dated March 2021; an email from the candidate's attorney submitting his letter; a re-evaluation by the original examiner in October and November 2020; a letter from the candidate's mother dated January 2020; a copy of the candidate's transcript from the University of Denver where he earned a graduate certificate in Healthcare Management with a GPA of 4.0 in March 2021; and finally, an article from Sage Open Source entitled, "Critical Issues in the Identification of Gifted Students with Co-existing Disabilities: The Twice-Exceptional."

In his personal statement, the candidate states that he now believes after his most recent evaluation that he now knows why "the results from all my other clinical and educational assessments should not serve as an alternative and more accurate indicator of my clinical knowledge and capacity to function at a high level as a clinical and/or research physician." He believes these earlier evaluations were performed without appropriate test accommodations and thus underestimated his abilities. He wants the Board to take note that he has a DSM-V diagnosis based on a reading rate at the 3rd percentile and reading comprehension at the 12th percentile on

- 2 -

Catherine Farmer, Psy.D.
RE: Dr. Jason Wright
April 10, 2021

timed tasks and that he has ADHD. He explains why he needs the test accommodations that he has requested of time and a half (for SLD), a separate, quiet environment (for ADHD), and stop the clock breaks (for fatigue). He now believes that his reading challenges have been identified and with accommodations he can more accurately reflect his knowledge on his next attempt at the USMLE Step 3 exam.

In his mother's letter, she writes that additional time on tests for children and adults without learning disabilities does not benefit them. Extra time only benefits those with a reading disability and, therefore, she requests that the Board grant him the extended time that he needs to take the exam.

The new evaluation by the original expert reiterates his background and reports that there are no significant changes since his prior evaluation. An extensive battery was administered but no standalone measures of motivation and effort were included. The candidate obtained a full-scale IQ of 121 on the Wechsler Adult Intelligence Scale-4th Edition (WAIS-IV), and his index scores ranged from a high average 111 on working memory index to a superior 120 on processing speed. To assess learning and memory, he was given the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) and he performed in the average to high average range for immediate and delayed memory.

To assess for academic achievement, he was administered the Wechsler Individual Achievement Test, 4th Edition (WIAT-IV), and age norms were used to derive scores. His listening comprehension was 98, average, oral expression 106, average, oral language composite 102, average. In terms of reading, his reading composite was 110, high average, decoding composite 103, average, and reading fluency composite 103, average. Thee scores are quite similar to those obtained in 2017 where the reading composite was 112. His expert makes much of the fact that on oral reading accuracy and oral reading rate subtests that his rate was below average for his age referencing the 25th percentile. The Board should note the WIAT-IV uses quartiles for these subscales and the bottom quartile ranges from the 1st to the 25th percentile. The 16th to 25th percentile are within the average range and only scores at the 15th percentile and below are below average for his age. Thus, his score could be solidly average to below average – there is no way of knowing given how this subtest was constructed. In 2017 he was average on these two subscales at the 49th and 50th percentile respectively for oral reading accuracy and rate. His written expression composite was 109, average. In 2017 it was 120, superior.

The candidate was also administered the Nelson Denny Reading Test (NDRT). His examiner uses the percentile scores to interpret his performance, which is unfortunate because college graduates are a much more competitive group than the average person in the general population. Instead, NDRT scale scores are the appropriate metric to use since they are based on the pooled norms for grades 10 to 14 and they have proven to be a very good proxy for age norms. The pooled norms have a mean of 200 and a standard deviation of 25. On the vocabulary test he earned a score of 247 which is almost a perfect score for timed vocabulary. His timed comprehension score of 207 is solidly average even though it is at the 12th percentile for college graduates, and the total score of 227 is above average. His reading rate score of 175 is at the

Catherine Farmer, Psy.D.
RE: Dr. Jason Wright
April 10, 2021

bottom of the normal range. It is at the 3rd percentile for college graduates. The reading rate on the NDRT is unreliable measure. It was based on only the first minute of the comprehension subtest and has poor retest reliability and therefore is not useful for diagnostic purposes.

Visual-motor functioning was average at the 58th percentile. The candidate was screened for emotional problems with the Symptom Checklist-90, and he endorsed mild symptoms of depression and worthlessness and a few symptoms of anxiety.

To assess for ADHD, he was given the Conners' Adult ADHD Rating Scale Self-Report and his scores placed him in the moderately atypical range for inattentive symptoms (T score of 69). He was markedly atypical only on problems with self-concept (T=70). His mother rated him on the observer scale and all of her ratings were within the average range. Similarly, on the Behavior Rating Inventory of Executive Functioning, Adult Version, the candidate rated himself moderately elevated on the global executive composite (T score of 66) and on the behavior regulation index (T score of 65), but his mother's ratings placed him totally within the average range. On the Integrated Visual and Auditory Continuous Performance Test, 2nd Edition (IVA-2), he did very well and there were no indications of feigned impairment and he performed quite well. His expert opined that his might be due to the fact that he was taking medications for ADHD at the time he took the exam.

As a result of this evaluation, his expert concluded that his reading rate on the Nelson Denny was at the 3rd percentile compared to his peers, and that his WIAT-IV oral reading fluency test was at the 30th percentile and substantially weaker than his untimed reading comprehension on the WIAT-IV at the 75th percentile, and that the NDRT comprehension was below average at the 12th percentile. His expert also stated that his reading accuracy was only at the 25th percentile on the WIAT-IV. His expert also reports that he continues to experience significant symptoms of ADHD referring to his self-report symptoms that do not match those of his mother. He did very well on the computerized performance test, but his expert says there was "evidence of notable distractibility during auditory attention tasks" but auditory attention was at the 62nd percentile, average, while full scale response control was in the above average range, auditory response control at the 86th percentile, visual attention was in the superior range at the 90th percentile. The expert referenced two minor measures as being problematic within the average auditory attention scale – auditory vigilance at the 4th percentile and elasticity at the 1st percentile – but this is in the context of a very strong performance that does not resemble the profile of individuals with attention problems.

After carefully reviewing the documentation submitted and in reviewing the entire file, including the most recent evaluation, I find that Dr. Wright is remarkably consistent in performing in the average range on standardized measures of reading comprehension. These include both high stake exams such as the SAT on three occasions, the GRE, the ACT on two occasions, the MCAT verbal reasoning, and the two evaluations by the candidate's expert in 2017 and 2020. On every single measure of reading administered he is solidly average and, in a few instances, above average. There is no report or objective evidence of childhood onset of reading disabilities and a long, well documented history of being average in his abilities to read.

Catherine Farmer, Psy.D.
RE:  Dr. Jason Wright
April 10, 2021

Similarly, as the Board's original review of his file noted, he had no trouble passing Step 1 with
a very respectable score of 226 and he passed Step 2 Clinical Knowledge with a respectable
score. For some reason, he is having difficulty with the Step 3 exam which is indeed a difficult
exam as it requires integration of all of the candidate's knowledge and ability to integrate in
quasi-real time which is a very difficult task. On this, he has failed on three occasions. However,
the evidence is clear his failure is not based on a reading disability that limits his access skills.
His well detailed past history shows that he is a solidly average reader and on the timed Step 1
and Step 2 Clinical Knowledge exams he was able to demonstrate his scientific and clinical
knowledge on multiple choice exams without test accommodations.

        In regard to Attention Deficit/Hyperactivity Disorder relative to DSM-V the
documentation provides no objective evidence of childhood onset of this disorder (as seen in
report cards, early evaluations, accidents, etc.), no evidence of multiple setting impact (as seen in
report cards or teacher ratings, performance evaluations, traffic tickets), no evidence of past or
current clinically significant impairment in school, occupation, or social relationships other than
repeated failure of a very difficult professional exam. In 2017 his expert did not diagnosis him
with ADHD because his issues had not been present in childhood. The candidate rated himself as
having significant attention symptoms but his mother's ratings of him were within the average
range.  This same pattern of ratings occurred in 2020 as well. The candidate reported significant
symptoms while his mother did not. He did well on a continuous performance test of attention on
the second evaluation, which his expert stated might be due to being in stimulant medication. In
his statement to his expert on the second occasion, he reports that a psychiatrist diagnosed him
with ADHD in 2011 at the age of 34. The Board did not receive a copy of that evaluation. His
expert reports that he was provided with a preschool evaluation when he was 5, which showed
"constant physical movement, fatiguing easily over the course of the testing session and often
responding with 'I forgot' which was interpreted by the examiner that he was uptight during the
examination and that it negatively impacted his performance on verbal subtests although his
performance was average." His expert also states that he reviewed results from the Iowa Test of
Basic Skills and other standardized exams from 4th through 11th grade which revealed a lot of
variability in his performance, but he does not report what that variability is. He attributes this to
ADHD. The Board should note that ADHD is not related to cognitive and academic problems
unless there are co-occurring learning disabilities.

        The expert also states that Dr. Wright felt that the medication he was taking was helpful
with his concentration, that he struggles in retaining what he has read, in completing exams
within the endorsed time. The Board should note that many people with and without ADHD find
that stimulant medication improves concentration and high percentages of college students with
and without disabilities reported wanting extra time, extra breaks, a separate room for exams
(Lewandowski, Lambert, Lovett, Panahon, & Sytsma, 2014).

        Therefore, I find little here to support the candidate's request for test accommodations
based on either a reading disability or ADHD. His documentation is not consistent with either
diagnosis and thus, I do not recommend that the Board grant him additional time. The Board
should note that there is controversy over the notion of twice exceptional students, those who are

Catherine Farmer, Psy.D.
RE:  Dr. Jason Wright
April 10, 2021


gifted and learning disabled. The empirical literature does not support such a category and it is not in the DSM-V or ICD.

In regard to the candidate's request for a separate and quiet environment, it is my impression that the testing centers that the NBME uses for exams provide very quiet environments and there is the option to use noise cancelling headphones. Given that the candidate has a history of failing the Step 3 exam and reports that he almost has panic attacks when thinking about taking the exam, he might benefit from the Board's extra break platform, which could be offered to him as a courtesy.

Sincerely,

*Marla Brassard*

Marla R. Brassard, Ph.D.
Consulting Psychologist (NYS #9522)