**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Case No. 21-cv-02319-DDD-NYW

JASON WRIGHT,

     Plaintiff,

v.

NATIONAL BOARD OF MEDICAL EXAMINERS

     Defendant.

---

**ORDER DENYING MOTION FOR
EMERGENCY PRELIMINARY INJUNCTION**

---

Plaintiff Jason Wright brings this action against Defendant National Board of Medical Examiners ("Board") alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 1201. Mr. Wright seeks an emergency preliminary injunction that would require the Board to provide him with accommodations during one of the standardized tests administered by the Board. (Doc. 8.) For the following reasons, the Court denies the motion.

## BACKGROUND

Mr. Wright holds a bachelor's degree, two master's degrees, and a medical degree. (Doc. 8-4 at 98.) His goal is to become a licensed physician in Colorado. (Doc. 8-2 at 11.) After graduating from medical school, an individual aspiring to be a licensed physician in Colorado must pass the United States Medical Licensing Examination ("USMLE"), a series of three tests, within a set period of time. (Doc. 11 at 2.)

From 2011 to 2013, Mr. Wright took Step 1, Step 2 Clinical Knowledge, and Step 2 Clinical Skills[1] of the USMLE without exam accommodations and passed all three. (Doc. 11 at 3.) Mr. Wright passed Step 2 Clinical Knowledge on his second attempt. (Doc. 8-4 at 77-82.) In 2017, Mr. Wright took Step 3 twice and did not pass on either attempt. (*See id.* at 62.) The following year Mr. Wright filed his first request for test-taking accommodations with the Board. (*Id.* at 77-82.) Mr. Wright's request followed a 2017 evaluation performed by Terri Lucero, a licensed clinical psychologist. (*Id.* at 1-16.) Dr. Lucero diagnosed Mr. Wright with Specific Learning Disorder, with impairment in reading comprehension. (*Id.* at 14.) The Board denied Mr. Wright's 2018 request for accommodations. (*Id.* at 83-84.) Mr. Wright then took the Step 3 exam without accommodations that year and again did not pass. (*See id.* at 62.)

In 2019, Mr. Wright completed a one-year master's program in which he received test-taking accommodations. (*Id.* at 33-34.) In 2020, Mr. Wright was again evaluated by Dr. Lucero. (*Id.* at 17-32.) This time Dr. Lucero diagnosed Mr. Wright with Specific Learning Disorder, with impairment in reading, and Attention Deficit Hyperactivity Disorder (inattentive type, mild). (*Id.* at 31.) For a second time, Mr. Wright petitioned the Board for accommodations on the Step 3 exam, which is next scheduled for October 21, 2021. (*Id.* at 85-90.) The Board denied this petition. (*Id.* at 91-92.) With the exam date approaching, Mr. Wright filed this case and an emergency motion for a preliminary injunction to receive accommodations on the upcoming Step 3 exam. (Doc. 8.)

---

[1]   The USMLE used to consist of two components for Step 2: Step 2 Clinical Skills and Step 2 Clinical Knowledge. Step 2 Clinical Skills has been discontinued, and the USMLE now only consists of Step 1, Step 2 Clinical Knowledge, and Step 3. Mr. Wright, however, took Step 2 Clinical Skills while it was still a part of the USMLE.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy that should only be granted "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 22 (2008). The Court can only issue a preliminary injunction if the party seeking the injunction has established each of the following factors:

1. That he is substantially likely to succeed on the merits;

2. That he is likely to suffer irreparable harm absent the injunction;

3. That his threatened injury outweighs the injury the opposing party will suffer under the injunction; and

4. That the injunction would not be adverse to the public interest.

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Preliminary injunctions that would alter the status quo, like this one would, are "disfavored and require a movant to satisfy a heightened standard." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883-84 (10th Cir. 2021). "When seeking a disfavored injunction, the movant 'must make a strong showing' both on the likelihood of success on the merits and on the balance of the harms." *Id.* at 883 (citing *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)).

## DISCUSSION

### I.   Likelihood of Success on the Merits

To establish this factor, Mr. Wright is required to make a strong showing that he is disabled under the ADA. While Mr. Wright has provided evidence showing that his conditions likely make reading, studying, and taking tests like the USMLE more difficult for him than for most others seeking to become doctors, the evidence does not support

the conclusion that he is he is substantially limited in comparison to the general population. And since it is the latter rather than the former that is required to establish disability under the ADA, he is not likely to succeed on his claim.

## A.  ADA Disability

Under the ADA, individuals who are disabled are entitled to reasonable accommodations. 42 U.S.C. § 12189. To be classified as "disabled" under the ADA, an individual must establish "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). There is no dispute that "learning, reading, concentrating, [and] thinking" are major life activities. 28 C.F.R. § 36.105(c)(1)(i).

And the definition of impairment includes "specific learning disability," listing "other specific learning disabilities" and "Attention Deficit Hyperactivity Disorder." 28 C.F.R. § 36.105(b)(1)(ii), (b)(2). Mr. Wright has supplied evidence sufficient to show that he likely has a learning disability that can, in some cases, substantially limit a major life activity.

The Tenth Circuit has noted, though, that a "learning disability alone does not necessarily trigger the protections of the Americans with Disabilities Act." *J.H. v. Bernalillo Cty.*, 806 F.3d 1255, 1261 n.4 (10th Cir. 2015). "The focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 29 C.F.R. § 1630.2(j)(4). The "term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

4

The substantial limitation, however, must be "as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). The comparison group is not "an academic peer group, or, in the case of standardized tests, to other test-takers who are not representative of the general population." *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. 15-4987, 2016 WL 1404157, at *6 (E.D. Pa. Apr. 11, 2016). Nor is the comparison group other "future doctors." *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011).

While Mr. Wright's condition may well put him at a significant disadvantage compared to his fellow USMLE test-takers, the evidence that it "substantially limits" him as compared to the general population is not sufficient to justify the extraordinary remedy of a preliminary injunction.

### B.  Mr. Wright's Evidence

In support of his claimed disability, Mr. Wright has supplied the following evidence:

1.  Mr. Wright's Declaration (Doc. 8-2 at 1-30.)

    Mr. Wright describes his academic history and challenges with reading that started during his childhood. In particular, he explains how he would mask his reading impairment from the other children in class. Mr. Wright also emphasizes the difficulties he has had on standardized examinations throughout his life. Despite his impairment, Mr. Wright graduated high school on time with a 3.0 GPA. He then attended college where he majored in psychology and minored in chemistry. To help his application to medical school, Mr. Wright completed a two-year public health degree program at the University of Colorado Anschutz Medical Campus. He scored below average on the MCAT but gained admission to the Ross University College of Medicine on the condition that he complete a medical education review program over the summer.

2. College Admission Test Scores (Doc. 8-4 at 44-55.)

Mr. Wright took the SAT exam three times. On the verbal portion of the exams, he scored in the 35th, 25th, and 32nd percentiles. On the math portion of the exams, he scored in the 59th, 53rd, and 41st percentiles. He took the Math I Subject Test and scored a 490. Mr. Wright scored an 18 and a 21 on the ACT. He scored an 18 and a 19 on the ACT reading section.

3. American Medical College Application Service Report & MCAT Scores (Doc. 8-4 at 56-59.)

Mr. Wright's American Medical College Application includes his GRE score breakdown and his MCAT scores. Notably, Mr. Wright scored a 450 on the verbal section of the GRE, which placed him the 44th percentile. Mr. Wright scored an 18P and a 19N on the two MCATs that he took.

4. USMLE Step 1 and Step 2 Score Reports & Exam Dates (Doc. 8-4 at 60-63.)

Mr. Wright passed the USMLE Step 1 exam with a score of 226. The score needed to pass the exam is 188. Mr. Wright passed the USMLE Step 2 Clinical Skills exam. Mr. Wright passed the Step 2 Clinical Knowledge exam with a 212 score. A score of 203 is needed to pass.

5. Medical School Transcript & Performance Evaluation (Doc. 8-4 at 64-71.)

Mr. Wright's medical school transcript is composed of average to above-average grades (As, Bs, and Cs). He graduated with a cumulative 3.19 GPA. As compared to his peers, Mr. Wright performed at a highly satisfactory level in the basic sciences.

6. Master's Programs Transcripts (Doc. 8-4 at 98; Doc. 9-1 at 1-3.)

Mr. Wright received A and B grades at his two-year health program. He completed the program with a 3.5 GPA. Mr. Wright received a 4.0 GPA in the one-year master's program.

7. USMLE Step 3 Score Reports (Doc. 9-1 at 4-11.)

The passing score on the USMLE Step 3 exam is a 196. On the April 2017 Step 3 exam, Mr. Wright failed with a score of 168. On the November 2017 Step 3 exam, Mr. Wright failed with a score

of 182. On the October 2019 Step 3 exam, Mr. Wright failed with a score of 180.

8. University of Denver Accommodation Verification (Doc. 8-4 at 35.)

   During his 2019-2020 master's program, Mr. Wright received 50% additional time on online exams and alternate format text for his textbooks.

9. First USMLE Accommodation Request (Doc. 8-4 at 77-82.)

   On September 28, 2018, Mr. Wright requested 100% additional time on the Step 3 exam. He referenced his 2017 Specific Learning Disability diagnosis, and a 2011 ADHD diagnosis.[2]

10. First Accommodation Request Denial (Doc. 8-4 at 83-84.)

    The Board denied Mr. Wright's first request for accommodations on the Step 3 exam. The letter highlighted that several of Mr. Wright's 2017 diagnostic scores placed him in the average to above-average range. The evaluator also noted Mr. Wright's strong performance on the Step 1 exam.

11. Second USMLE Accommodation Request (Doc. 8-4 at 85-90.)

    On March 14, 2021, Mr. Wright petitioned the Board for accommodations on the Step 3 exam for a second time. This time he requested additional break time and 50% additional time. In the disabilities section, he listed his 2017 Specific Learning Disorder diagnosis, his 2011 ADHD diagnosis, and a 2008 Specified Depressive Disorder diagnosis. He also noted that he had not received accommodations on any previous standardized test he had taken.

12. Second Accommodation Request Denial (Doc. 8-4 at 91-93.)

    The Board again denied Mr. Wright's request for accommodations. In its letter, the Board emphasized the lack of accommodation evidence over Mr. Wright's academic career. The Board also took concern with the weight Dr. Lucero gave to Mr. Wright's scores on the Nelson Denny Reading Test because the comparison group was to college graduates, not the general population. When

---

[2]   The Court has not received any other documentation or a professional evaluation of this 2011 diagnosis.

Mr. Wright's Nelson Denny Reading Test scores are compared to the general population, he performed in the average range. The Board also noted Mr. Wright's performance on other diagnostic tests and other standardized exams.

13. 2017 Psychoeducational Evaluation (Doc. 8-4 at 1-16.)

Mr. Wright was first evaluated in 2017 by Dr. Terri Lucero. She performed several psychoeducation tests on Mr. Wright and diagnosed him with Specific Learning Disorder, with impairment in reading comprehension.

14. 2020 Neuropsychological Evaluation (Doc. 8-4 at 17-32.)

In 2020, Mr. Wright was evaluated by Dr. Lucero again. Dr. Lucero performed learning disability tests and interviewed Mr. Wright and his mother. Dr. Lucero diagnosed Mr. Wright with a Specific Learning Disorder, with an impairment in reading, Attention Deficit/Hyperactivity Disorder (Inattentive type, mild), and Other Specific Depressive Disorder.

This evidence shows that Mr. Wright has a condition that limits his reading, ability to process information, and concentrate as compared to others taking the Step 3 exam. But as the Board emphasizes, that is not the question under the ADA. The question, instead, is whether this impairment substantially limits Mr. Wright as compared to the general population. On this, Mr. Wright is unlikely to succeed.

### 1. Academic History

Despite his academic success that largely occurred without accommodations, Mr. Wright contends that the "Board's focus on grades and outcomes on a standardized test has little or no relevance when making accommodation determinations." (Doc. 8-1 at 12.) The applicable Department of Justice guidance states that "Congress's discussion of the relevance of testing outcomes and grades clearly indicates that it did not consider them definitive evidence of the existence or non-existence of a disability." 28 C.F.R. Pt. 35, App. C, 81 Fed. Reg. 53237 (2016). Indeed,

"while tests and grades typically are numerical measures of performance, the capacity to quantify them does not make them inherently more valuable with respect to proving or disproving disability." *Id.* But the DOJ's guidance does not preclude the consideration of grades and outcomes; rather, they simply cannot be the only determining factor.

Among other considerations, courts have relied on academic performance to determine whether an individual is disabled under the ADA. *See Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462, 464-65 (5th Cir. 2019) (unpublished) (noting that the plaintiff had performed within the normal range on other tests); *Palotai v. Univ. of Md.*, 38 F. App'x 946, 955 (4th Cir. 2002) (unpublished) (highlighting the plaintiff's "demonstrated record of academic achievement" when evaluating whether there was substantial limitation); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1250-51 (M.D. Fla. 2017) ("Of course, average (or above-average) performance presumptively establishes the absence of substantial limitation."); *Love v. Law Sch. Admission Council*, 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (noting that plaintiff had ACT and SAT scores "within the average range" with no accommodations, a 3.16 high school GPA, and did well in college without accommodations).

Mr. Wright has had a history of impressive academic success with average to slightly below average performances on standardized tests as compared to more competitive groups. Mr. Wright's 18 and 21 scores on the ACT placed him in the slightly below average to average range of college-bound students. (Doc. 8-4 at 52, 54.) On the reading portion of the ACT, Mr. Wright scored slightly below average with scores of 18 and 19. (*Id.*) Mr. Wright scored below average on the verbal portion of the SAT, specifically in the 25th, 32nd, and 35th percentiles, as compared to other college-bound students. (*Id.* at 44-49.) While these data

points favor Mr. Wright, they are compared to other college-bound students, not the general population, and do not necessarily indicate substantial limitation. Mr. Wright scored a 450 on the verbal portion of the GRE, which placed him in the 44th percentile. (*Id.* at 56.) Mr. Wright's 18P and 19N MCAT scores placed him below the 24.7 average as compared to other future medical student examinees. (*Id.* at 56-59.) Again without accommodations, Mr. Wright scored above the necessary passing score on both the USMLE Step 1 exam and the USMLE Step 2 Clinical Knowledge exam. (*Id.* at 60-63.) On the Step 1 exam, Mr. Wright scored a 226, which is 38 points above what he needed to pass. (*Id.*) On the Step 2 Clinical Knowledge exam, Mr. Wright scored a 212, 9 points above what he needed to pass. (*Id.*)

Mr. Wright obtained a bachelor's degree with a major in psychology and a minor in chemistry. (Doc. 8-4 at 12.) He completed a two-year public health graduate degree program at the University of Colorado Anschutz Medical campus with a 3.5 GPA. (*Id.*) Before starting medical school, Mr. Wright completed a medical education review program and passed its final exam. (*Id.*) He gained admission to the Ross University School of Medicine and graduated with a 3.19 cumulative GPA. (*Id.* at 65.) Mr. Wright then completed a one-year master's program. (*Id.*) In that program, he received accommodations for his condition and achieved a 4.0 GPA.

This academic history does not support the contention that Mr. Wright is substantially limited in reading, learning, or thinking as compared to the general population. Even without accommodations, Mr. Wright's academic career has been at least average—as compared to others in similar programs and courses. And of course, those groups are in general more competitive than the general population, so his performance is well above average compared to the appropriate group.

While it is true that Mr. Wright may have had to work harder than many others in these advanced academic courses to achieve what he has (and he should be commended for that), the evidence is simply not there that his disability puts him at a significant disadvantage to the general public. Likewise, while it seems likely that accommodations would allow Mr. Wright to improve his performance (as his 4.0 GPA in the master's program shows), ADA accommodations are intended to level the playing field, not provide an unfair advantage. *See Rush v. Nat'l Bd. of Med. Exam'rs*, 268 F. Supp. 2d. 673, 677 (N.D. Tex. 2003).

Mr. Wright has a history of proficient test scores. He has demonstrated an ability to do well in school, get through college, obtain a master's degree, and be admitted to and graduate from medical school. Every one of these accomplishments is something that most people do not do. It is difficult to argue that someone with those accomplishments, predominately achieved without accommodations, is disabled compared to the average person. It is admirable that Mr. Wright has been able to achieve so much despite a learning impairment. But that does not change the legal standard.

### 2.   Accommodation History

Mr. Wright cites previous accommodations he received. Courts may consider whether there is a history of accommodations when determining whether an individual is disabled under the ADA. *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99, 2019 WL 4040576, at *25 (S.D. Ohio 2019) (emphasizing that plaintiff had a well-documented history of formal and informal accommodations); *Black*, 281 F. Supp. 3d at 1250-51 (noting that, among other factors, the plaintiff had never requested accommodations from kindergarten through medical school). Mr. Wright did not receive test-taking accommodations in elementary

school, middle school, high school, college, or medical school. Mr. Wright did, however, receive accommodations at the one-year master's program he completed from 2019-2020. (Doc. 8-4 at 3-4.) He argues that the accommodations he received during his master's program should be given considerable weight. But he has never received test-taking accommodations on any standardized exams he has taken, which include the SAT, ACT, MCAT, GRE, USMLE Step 1, and USMLE Step 2 Clinical Knowledge. (*Id.* at 88.) The first time Mr. Wright requested test-taking accommodations was in 2019 for his third attempt on the USMLE Step 3 exam. (*Id.*) While not dispositive, the limited evidence Mr. Wright presents of his history of accommodations cuts against his ability to show that he is likely to succeed on the merits.

### 3.  Psychological Evaluations

Mr. Wright emphasizes that his 2020 reading scores on the Wechsler Individual Achievement Test—Fourth Edition, which is a test that measures an individual's performance in areas of academic work, were below that of an individual with "superior verbal reasoning skills." (Doc. 8-1 at 5.) Notably, his reading accuracy on this test placed him in the 25th percentile. (*Id.*) But Mr. Wright fails to acknowledge that some of his other reading scores on the same test are much higher. Mr. Wright, for example, scored in the 75th percentiles for reading composite and reading comprehension. (Doc. 8-4 at 24.) Although Mr. Wright scored in the 30th percentile for oral reading fluency and below the 25th percentile in oral reading rate, his reading fluency and decoding composite placed him in the 58th percentiles. (*Id.*)

Mr. Wright notes that he has been evaluated by the same psychologist, Dr. Lucero, twice. (Doc. 8-4 at 1, 17.) On both occasions, he was

diagnosed with a Specific Learning Disorder, with impairments in reading. His 2017 evaluation, however, did not include an ADHD diagnosis. (*Id.* at 14.) While these evaluations do indicate consistency in one of Mr. Wright's diagnoses, his scores on the 2017 reading assessments indicate average to above-average performance. On the Weschler Individual Achievement Test—Third Edition, Mr. Wright scored in the 68th percentile for reading comprehension, the 77th percentile for pseudoword decoding, and the 47th percentile for oral reading fluency. (*Id.* at 10.) Dr. Lucero noted that Mr. Wright's reading scores placed him in the average to high-average range as compared to his peers. (*Id.* at 8.) Indeed, Mr. Wright was in the 70th percentile for total reading and the 78th percentile for basic reading. (*Id.* at 11.)

Mr. Wright argues that the difference in his performance under timed versus untimed conditions qualifies him as disabled. On the Wechsler Individual Achievement Test—Fourth Edition Oral Reading Fluency task he scored in the 30th percentile under timed conditions but scored in the 75th percentile when the task was performed untimed. (*Id.* at 4.) Even so, other courts have found similar percentiles to be considered average. *Bibber*, 2016 WL 1404157, at *3 (noting that a score in the 34th percentile of the Wechsler Individual Achievement Test—Third Edition was average). This Court is not convinced that scoring in the 30th percentile constitutes evidence of a substantial limitation. And the Wechsler Individual Reading Achievement Test—Fourth Edition uses a comparison group of similarly aged individuals. (Doc. 8-4 at 24.) The data provided is analyzed in light of a subset of the population—likely individuals in their early 40s—not the general population as required by the ADA standard. *See Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1103 (D.C. Cir. 2007) (rejecting as comparison group those of "similar age and educational background").

Mr. Wright also points to the difference in his scores on the Nelson Denny Reading test, a test designed to measure an individual's reading capabilities. On that test he scored in the 12th percentile for reading comprehension under standard-time conditions, but the 68th percentile under extended-time conditions. (Doc. 8-1 at 4.) But again, while this shows that extended time may allow Mr. Wright to significantly improve his score, it does not necessarily establish that his reading ability is significantly limited compared to the general population. Courts have found individuals are not disabled under the ADA even when there are significant score increases under extended-time conditions. *See, e.g.*, *Bibber*, 2016 WL 1404157, at \*3 (noting that the plaintiff's Nelson Denny Reading Test score went from the sixth percentile to the 99th percentile when test was administered untimed).

Dr. Lucero's evaluations emphasize Mr. Wright's results on the relatively common Nelson Denny Reading Test. Mr. Wright emphasizes that he scored in the third percentile overall on the Nelson Denny Reading Test and in the 12th percentile on the reading comprehension portion of the test. (Doc. 8-1 at 4.) Although these score results are below average, the comparison group used is inapt. As the Board's expert pointed out, Mr. Wright's scores on the Nelson Denny Reading Test are compared to college graduates, not the general population. (Doc. 8-4 at 92.) Courts have consistently rejected narrowing the comparison group in this manner. *See, e.g.*, *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1066 (9th Cir. 2005) (rejecting comparison to "others in his academic peer group"); *Gonzales v. Nat'l Bd. Med. Exam'rs*, 225 F.3d 620, 631 (6th Cir. 2000) (rejecting comparison to "other persons who have completed their second year of medical school").

Mr. Wright next argues that the "ADA effectively mandates that the Board provide accommodations based on the recommendations from

professionals, such as Dr. Lucero, who has provided two first-hand in-person evaluations of Mr. Wright." (Doc. 8-1 at 10.) It would certainly make courts' jobs easier if that were the case. But a professional evaluation is not the only piece of evidence a court should consider under the ADA. A diagnosis alone does not satisfy the ADA disability standard. *J.H.*, 806 F.3d at 1261 n.4. Nor does Mr. Wright provide precedent that a diagnosis evaluation alone qualifies an individual as disabled under the ADA. In fact, courts have frequently denied motions for preliminary injunctions where the plaintiff had a professional evaluation and diagnosis. *See Russell v. Phillips 66 Co.*, 687 F. App'x 748, 754 nn.7, 8, 9 (10th Cir. 2017); *Bibber*, 2016 WL 1404157; *Love*, 513 F. Supp. 2d at 214. In contrast, the court in *Berger*, for example, found that the plaintiff was disabled under the ADA because the plaintiff had professional evaluations *and* a history of accommodations. 2019 WL 4040576, at *29.

Mr. Wright also contends that Dr. Lucero's evaluations of him should be given more weight than those from the Board's experts because Dr. Lucero's evaluation was individualized and in-person. (Doc. 8-1 at 11.) The Court agrees that due weight should be given to the individualized evaluation and does not discount Dr. Lucero's evaluations and assessments. And there is little doubt that Dr. Lucero is correct that some of Mr. Wright's difficulties on the USMLE Step 3 exam are the result of a learning impairment, and that the accommodations he seeks would likely allow him to improve his score—perhaps even to pass. But that, and Dr. Lucero's evaluation, are not the only factors the Court must consider in resolving the ultimate legal question, which is whether the conditions identified by Dr. Lucero limit Mr. Wright's abilities in a manner that meets the legal requirements of the ADA. *Berger*, 2019 WL 4040576; *D'Amico v. N.Y. State Bd. of Law Exam'rs*, 813 F.

Supp. 217 (W.D.N.Y. 1993). While the Court agrees Dr. Lucero's assessments are likely sufficient to establish that Mr. Wright has a learning impairment and that the accommodations he seeks would improve his chances of passing the Step 3 exam, the Court cannot defer to her judgment that his condition substantially limits his ability to read, read under timed conditions, cognitively process, or concentrate in comparison to the population at large. The evidence to the contrary, in fact, is significant.

When compared to college graduates and individuals his age, Mr. Wright demonstrates evidence of limitation. But that is not enough. To be disabled under the ADA, he must show that he has a *substantial limitation* as compared to the *general population*. The evidence currently before the Court simply does not show that he is likely to succeed in making that showing.

### C. Precedent Granting Preliminary Injunctions

The contrast with other cases requiring accommodations is illuminating. In *Bartlett v. New York State Board of Law Examiners*, then-Judge Sotomayor's holding that the plaintiff was disabled under the ADA highlighted (1) 8th percentile reading rate scores compared to high school freshmen on the untimed version of a diagnostic reading test; (2) that the plaintiff needed people to read to her, write for her, and edit her basic grammar and spelling; and (3) that the plaintiff was unable to skim or scan text. No. 93 CIV. 4986(SS), 2001 WL 930792, at *7, *36 to *37 (S.D.N.Y. Aug. 15, 2001). Mr. Wright's diagnostic scores are much higher and compared to above-average subsets of the population. Although Mr. Wright describes difficulties in reading as compared to his peers in primary school, he provides no additional evidence from teachers, tutors, or counselors at the time. (Doc. 8-2 at 7.)

In *Rothberg v. Law School Admission Council*, the plaintiff's diagnosis dating back to fourth grade, history of reading tutoring, and history of accommodations dating back to high school and received on the ACT were sufficient to require accommodations. *Rothberg I*, 300 F. Supp. 2d 1093, 1095-96 (D. Colo. 2004) (unpublished), *rev'd on other grounds*, *Rothberg II*, 102 F. App'x 122 (10th Cir. 2004). Mr. Wright shows no such lengthy record of diagnosis, tutoring, or accommodations.

And in *Ramsay v. National Board of Medical Examiners*, the Eastern District of Pennsylvania noted the plaintiff's well-documented history of reading challenges, including scoring in the 13th percentile in word reading in first grade. 2019 WL 7372508, at *36 n.10 (E.D. Pa. 2019). In affirming the district court, the Third Circuit emphasized the plaintiff's accommodations in college and medical school and "abnormally low abilities in processing information, writing, and reading." 968 F.3d 251, 254-55 (3rd Cir. 2020). Mr. Wright, in contrast, lacks evidence of accommodations from more than one institution and has diagnostic scores that are in the average to above-average range when compared to the general population. Mr. Wright fails to include any specific assessments indicating that he has struggled with reading throughout his life.

In sum, Mr. Wright has failed to meet his heightened burden of demonstrating a likelihood of success on the merits.

## II. Irreparable Harm and Balance of Harms

Even if he had shown a strong likelihood of success on the merits, to obtain the preliminary relief he seeks Mr. Wright would also need to demonstrate that "irreparable injury is *likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, and make a strong showing that the balance of harms weighs in his favor, *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

Mr. Wright argues that if he fails the upcoming USMLE Step 3 exam, he will have exhausted the general time limit set by the Colorado Medical Board. (Doc. 8-1 at 13.) The only path left for Mr. Wright then would be to apply for a "good cause" exception, which may be granted in the Colorado Medical Board's discretion. (*Id.*) Mr. Wright also asserts that failing the Step 3 exam again may end his medical career, something he has invested a considerable amount of time and money in. (*Id.* at 14.)

The Board counters that Mr. Wright's harm is speculative because an exception exists, and that he created the time-sensitive nature of this case. (Doc. 11 at 18.) Its own harm if an injunction is granted, the Board argues, outweighs the potential harm to Mr. Wright if an injunction is denied because it has a "strong and legitimate interest in ensuring that the USMLE program is fair to all examinees." (*Id.*)

If this Court denies an injunction, Mr. Wright may well suffer harm. A lack of accommodations during the Step 3 test may well make passage less likely. Whether that amounts to legally irreparable harm, however, is not quite so clear. To begin with, Mr. Wright's argument that irreparable harm is presumed in ADA cases is not quite correct. *See First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141, 1143 (10th Cir. 2017); *Fish v. Kobach*, 840 F.3d 710, 751 n.24 (10th Cir. 2016); *Rothberg II*, 102 F. App'x at 125.

And the emergency nature of this motion is questionable for three reasons. First, Mr. Wright states that the "October 2021 test is not his only or last opportunity" to take the Step 3 exam. (Doc. 12 at 7.) Indeed, "Mr. Wright is permitted to retake the exam if he fails to pass it." (*Id.*) If the October 2021 exam is not his only or last opportunity, it surely cannot cause him irreparable harm if he is denied accommodations for that particular exam. Second, it may be that the relevant deadline to

pass his exams has *already* elapsed. As the Board notes, Mr. Wright may be subject to a seven-year, rather than a ten-year, time limit to pass all three steps of the USMLE.[3] (Doc. 11 at 15.) Third, regardless of whether the deadline has passed or is about to pass, prevailing on an ADA claim likely qualifies Mr. Wright for the good-cause exemption to the applicable time limit. *See Mahmood v. Board*, No. 12–1544, 2012 WL 2368462, at *5 (E.D. Pa. June 21, 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives. For example, [plaintiff] does not discuss whether her school might grant her an extension of the seven-year requirement . . . .").

While delay in pursuing his career may be harmful, a delay of educational opportunities generally does not constitute irreparable harm for purposes of a preliminary injunction. *See Martin v. Helstad,* 699 F.2d 387, 391–92 (7th Cir. 1983) (cited in *Rothberg II*, 102 Fed. App'x at 126). Another problem is that the emergency nature of this litigation is at least in part due to Mr. Wright's own choices. He has taken the USMLE Step 3 three times since 2017 and requested accommodations twice but did not bring this case until August 27, 2021. The inability to fully litigate his claims before the apparent testing deadline is at least in part of his own doing.

To the extent he has shown likely irreparable harm, it is not clear that his harm outweighs the harm to the Board that would be caused by erroneously granting an injunction. The Board administers a highly competitive licensing exam for future medical doctors, so it is "impera-

---

[3]   *Compare* 3 Colo. Code Regs. 713-17:100-17.2(D), *with* 3 Colo. Code Regs. 713-17:100-17.2(D)(1).

tive that standards for accommodations be uniform and fairly adminis-tered." *Rothberg II*, 102 Fed. App'x at *127 (McConnell, J., concurring). Providing unwarranted accommodations to Mr. Wright could under-mine the exam process itself, and the scores of the other test-takers. That potential harm to the Board, other test takers, and the public—which depends on the fair administration of medical-licensing require-ments—outweighs the potential harm to Mr. Wright if a preliminary in-junction is erroneously denied. While the harm alleged by Mr. Wright "could mean a temporary delay of [his career plans]," the harm to the Board is more certain.[4] *Rothberg II*, 102 F. App'x at 126.

Because Mr. Wright has not met his burden on the other elements, the Court need not address the public interest element. *See State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021).

---

[4]    Mr. Wright also argues that the combination of inability to practice medicine and "serious debt associated with his medical school tuition and expenses" outweigh the Board's harms. (Doc. 8-1 at 16.) While the Court is certainly sympathetic to Mr. Wright's time and monetary in-vestment, those harms remain more speculative, as Mr. Wright can still take the Step 3 exam and apply for an exception if necessary. It is not certain that Mr. Wright will fail the October 2021 Step 3 exam. *See Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (it is "not certain that [he] will suffer the predicted harm; [he] may pass the test"). Nor is it certain that he will be denied an exception. *See Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated"). And monetary injury normally does not constitute irreparable harm be-cause it is compensable with damages.

## CONCLUSION

Mr. Wright's emergency motion for a preliminary injunction (Doc. 8) is **DENIED**.


DATED: October 15, 2021              BY THE COURT:

                                     _____
                                     Hon. Daniel D. Domenico
                                     United States District Judge